RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 11/22/13

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

LISA ANN SYLVAIN,                       CIVIL ACTION
        Appellant                       1:13-cv-00014

VERSUS

CAROLYN W. COLVIN, ACTING        JUDGE JAMES T. TRIMBLE
COMMISSIONER OF SOCIAL SECURITY,[1]    MAGISTRATE JUDGE JAMES D. KIRK
        Appellee

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Lisa Ann Sylvain ("Sylvain") filed an application for supplemental security income benefits ("SSI") on July 28, 2010, alleging a disability onset date of July 6, 2010 (Tr. p. 122). Sylvain then filed a second application for SSI on January 6, 2011 alleging a disability onset date of July 6, 2010 (Tr. p. 126) due to epilepsy and diabetes (Tr. p. 192). Those applications were denied for both SSI and disability insurance benefits ("DIB") (Tr. pp. 79, 83).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on October 4, 2011, at which Sylvain appeared with her attorney and a vocational expert ("VE") (Tr. p. 25). The ALJ found

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.

that, although Sylvain has severe impairments of seizure disorder and diabetes, she has the residual functional capacity to perform medium work except that she must avoid exposure to heights and dangerous machinery, and she should not drive (Tr. pp. 13-15). The ALJ concluded there are jobs existing in significant numbers which Sylvain can perform, such as hand packager and general office clerk and, therefore, Sylvain was not disabled within the meaning of the Social Security Act at any time through the date of his decision on November 21, 2011 (Tr. pp. 19-20).

Sylvain requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Sylvain next filed this appeal for judicial review of the Commissioner's final decision. Sylvain raises the following issues on appeal (Doc. 10):

> 1. The claimant's description of the frequency of her seizures was improperly rejected without the proper assessment of credibility required by the regulations.
>
> 2. The ALJ's failure to provide a proper assessment of credibility is not harmless because the record shows prejudice to the claimant.

The Commissioner filed a brief in response (Doc. 11), to which Sylvain replied (Doc. 12). Sylvain's appeal is now before the court for disposition.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act.

2

42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

At the time of her 2011 administrative hearing, Sylvain was 41 years old (Tr. p. 30), had a high school education and some college (Tr. p. 30), and had past relevant work as a Psych Aide at Central State Hospital (1999-2010) and a nursing assistant in a nursing

home (1991-1999) (Tr. pp. 31-32, 221).

### 1. Medical Records

In October 2008, Dr. Dametria Sinegal, a family medicine doctor, treated Sylvain for gestational diabetes (Tr. p. 324). Sylvain was 5'5" tall, weighed 204 pounds, and her blood pressure was 137/76 (Tr. p. 324). Sylvain had diabetes during a previous pregnancy, was taking Glyburide, and was monitoring her blood sugar (Tr. p. 325). Sylvain was also taking Elanapril for prevention of microalbuminemia and Tegretol for seizures (Tr. p. 325). Dr. Sinegal diagnosed controlled Type II diabetes mellitus and pregnancy (Tr. p. 326). Dr. Sinegal replaced Sylvain's Gluburide with Humulin and Humalog injections (Tr. p. 321).

In November 2008, Dr. Sinegal found that Sylvain's diabetes was improved and controlled (Tr. p. 317). However, in January 2009, Sylvain's diabetes worsened due to noncompliance with her diet, although it was still controlled, and her insulin was increased (Tr. pp. 312-313).

In December 2008, Sylvain was treated for pregnancy with seizures and vomiting throughout the day (Tr. p. 284); she was prescribed Tegretol, Topamax, Unsulin, and prenatal supplements (Tr. p. 285).

In February 2009, Sylvain's blood pressure was 125/78 and her diabetes was controlled and improved (Tr. pp. 304-310). In April 2009, Sylvain's blood pressure was 143/85, she reported that her gynecologist was considering an early delivery due to her fluctuating blood pressure, and her diabetes was only fairly

4

controlled (Tr. pp. 300-302). Later that month, Sylvain was found to be noncompliant with her medications, smoking cigarettes, and had recently ben hospitalized for Braxton-Hicks contractions and having hypotensive episodes (Tr. pp. 296-298). At the end of April, after she had delivered her child, Sylvain weighed 198 pounds, her blood pressure was 171/98, and her legs were swollen; Sylvain was prescribed Lasix, Lantus, Glyburide, and Enalapril (Tr. pp. 291-294).

In May 2009, Sylvain weighed 193 pounds; she complained of hypertension, diabetes mellitus II, and peripheral edema (Tr. pp. 287-288). Sylvain admitted she had not been checking her blood pressure due to going to the hospital to check on her newborn five times a day, and she was also noncompliant with glucose monitoring and her diabetes medications (Tr. p. 288). Dr. Sinegal diagnosed labile hypertension, edema, and uncontrolled Type II diabetes mellitus, as well as chronic rhinitis, and prescribed Singulair, Lasix, and Vasotec (Tr. p. 289).

In September 2009, Sylvain was examined by Dr. Gregory Bevels, a family medicine doctor, who referred her to Dr. Ugokwe for her seizures (Tr. pp. 340, 355). In January 2010, Dr. Bevels found that Sylvain's Type II diabetes mellitus was controlled through diet (Tr. p. 337). In May 2010, Dr. Bevels found Sylvain had a high risk Framingham Score (which measures the ten year cardiovascular risk), prescribed Glyburide, and referred her for diabetic education (Tr. pp. 332-333).

In September 2009, Sylvain was evaluated by Dr. Charles

Ugokwe, a neurologist, for her seizures (Tr. p. 355).  Dr. Ugokwe noted that Sylvain reported a history of seizures since 1997, and described her seizures as day-dreaming for three to four minutes associated with tongue biting (Tr. p. 355).  Sylvain reported she had two to three seizures per week, but her last episode was one and a half weeks ago; although she had previously been seizure-free for a year, her seizures recently increased in frequency (Tr. p. 355).  Sylvain had been taking Tegretol and Topamax to control her seizures (Tr. p. 355).  Sylvain also complained of numbness and tingling in her hands and feet at times, limiting her ambulation, nocturnal snoring and gasping for air, and fatigue (Tr. p. 355).  Dr. Ugokwe diagnosed partial epilepsy complex-partial seizures, diabetic polyneuropathy, and obstructive sleep apnea (Tr. p. 357).  Dr. Ugokwe instructed Sylvain in seizure precautions and prescribed Tregretol and Topamax (Tr. p. 357).

In November 2009, Dr. Ugokwe examined Sylvain for complaints of increased seizures, described as behavior arrest followed by periods of confusion and walking in circles for several minutes, after which she is tired (Tr. p. 353).  An EEG was abnormal and suggestive of partial epilepsy (Tr. p. 389), and an MRI study of her brain was normal (Tr. p. 390).  Dr. Ugokwe diagnosed partial epilepsy, prescribed Tegretol, and told Sylvain not to drive and to notify the Department of Motor Vehicles of her seizures (Tr. p. 353).  Sylvain reported continued seizures in December 2009 and April 2010, and Dr. Ugokwe diagnosed "intractable partial epilepsy with brake through seizures," discontinued the Tegretol and

prescribed Carbatrol and Keppra, added Diastat for seizures lasting longer than three minutes, and continued Sylvain's no-driving status (Tr. pp. 346, 351). A 48-hour ambulatory EEG in January 2010 was normal, but did not exclude seizures (Tr. p. 388). In July 2010, Dr. Ugokwe diagnosed epilepsy with complex seizure intractable, polyneuropathy in diabetes, and other convulsions, noted Sylvain's seizures tend to occur in clusters, with variable frequency, added Vimpat to her medications, and reminded her that she cannot drive (Tr. pp. 341-343, 376, 394).

In March 2011, Sylvain was examined by Dr. Omar Saleem, an orthopedic surgeon, who found she was 5'5" tall, weighed 174.8 pounds, her blood pressure was 135/85, her visual acuity with correction was 20/40 in each eye, and she admitted smoking less than one pack per day (Tr. pp. 397-401). Sylvain stated that she tries to control her diabetes with diet, exercise and medication, and that she checks her glucose daily and it usually runs in the 150s (Tr. p. 397). Dr. Saleem noted that Sylvain has a high school education, is a Certified Nursing Assistant, and is independent in the majority of her activities of daily living (Tr. p. 398). Dr. Saleem found that Sylvain's upper and lower extremities had normal strength and reflexes bilaterally (Tr. p. 399). Dr. Saleem stated that, based on his musculoskeletal exam, Sylvain should be able to sit and stand, pull and push, kneel, crawl and crouch, and reach, grasp, handle and finger objects (Tr. p. 400).

Also in March 2011, Sylvain admitted to Dr. Bruce Craig, a family medicine doctor, that she had not taken her diabetes

medication, Glyburide, in six months (Tr. p. 424). At that time, her blood sugar was 312 (Tr. p. 424). In August 2011, Sylvain's blood sugar was 196 (Tr. p. 423).

Sylvain went to LSU Health Services Center in Shreveport in July 2011 due to her seizures (Tr. p. 430). Dr. Orhan Bican, a neurologist, noted that Sylvain had recently had a seizure while driving and ended up in a car accident (Tr. p. 432). Sylvain also reported smoking half a pack of cigarettes per day (Tr. p. 432). Sylvain weighed 167 pounds and her blood pressure was 150/70 (Tr. p. 433). Dr. Bican diagnosed partial complex seizures, instructed Sylvain not to drive initially, increased her Keppra, and maintained her Carbatrol (Tr. pp. 432-434).

2. 2011 Administrative Hearing

At her October 2011 administrative hearing, Sylvain testified that she is 41 years old, lives in a house with her father and her two-year-old daughter, has a high school education, and attended college for a year and a half (Tr. pp. 30, 33).

Sylvain testified that she worked as a nurse's aide in a nursing home from 1998 to 1999 (Tr. p. 32). Sylvain testified that she was a psychological aide at Central State Hospital from 1999 until July 2010, working with the criminally insane in an institutional setting (Tr. pp. 31-32, 50). Sylvain testified that she would take clients back and forth to court and doctors' appointments, and help them with their daily therapies and training (Tr. p. 32). Sylvain testified that her seizures had been worsening until she had one while she was with a client on an out-

8

of-town doctor visit; while Sylvain had a seizure, the security officer left to notify others of what was happening, and the client ran away (Tr. p. 32). Sylvain testified that she was asked to resign (or else be fired), so she did and tried to work in Special Education (Tr. p. 32). Sylvain testified that she last worked in November 2010, for about one month, as a residential trainer at the Special Education Center for disabled children (Tr. p. 31); she worked with the children in the institutional setting where they lived and received therapy (Tr. pp. 50-51). Sylvain testified that she could not continue to work there because she was having seizures while she was trying to deal with the children, and had almost dropped a child (Tr. p. 31). Sylvain testified that she does not have any problems getting along with other people (Tr. p. 39).

Sylvain testified that she did not draw unemployment or workers' compensation, and that her only source of income is $150 per month for child support (Tr. p. 33).

Sylvain testified that she does not have any physical pain other than headaches after her seizures (Tr. p. 33). Sylvain also testified that her diabetes is controlled by medication (Tr. p. 33). Sylvain testified that her seizures started in 1997, and that she has two kinds of seizures; one is a grand mal seizure during which she falls, trembles, shakes, chews her tongue, urinates, and does not remember anything, and the other is a fainting type of seizure (Tr. p. 34). Sylvain testified that she had not identified anything that precipitates her seizures (Tr. p. 35). Sylvain

testified that, during the fainting type of seizure, she has been told that she moves around, walks around in a daze, does not know who she is or who other people are, she may fight or take off her clothes and once was found walking outside without her clothes on, and she nibbles on her tongue and lips (Tr. pp. 40-41). Sylvain testified that, during a grand mal seizure, she falls, shakes, trembles, bites her tongue hard, which has caused a "split" in the side of her tongue, urinates, once defecated, and is usually put into bed, where she wakes up feeling weak and has a headache, and it takes her about 24 hours to recover (Tr. pp. 41-42). Sylvain testified that the seizures cause memory loss, which a doctor told her was a "memory block on the brain" (Tr. p. 43). Sylvain testified that she has trouble remembering people (Tr. p. 43).

Sylvain testified that she started keeping a seizure diary, which shows she had eleven seizures in August and five in September (Tr. pp. 45-46). Sylvain testified that five seizures in a month is fewer than normal (Tr. p. 46).

Sylvain testified that, during the day, she has coffee when she gets up in the morning, cleans the house, and plays with her daughter (Tr. p. 35). Sylvain testified that her medication makes her sleepy, so her father watches the baby when Sylvain naps (Tr. pp. 35, 45). Sylvain testified that she uses public transportation to go to the grocery store, since she is not able to drive any more (Tr. p. 35). Sylvain testified that she has to go at least six months without a seizure before she can drive again (Tr. p. 37). Sylvain testified that her friends and family visit her, and she

10

goes to church (less than half a mile down the road) with her father (Tr. pp. 35-36).  Sylvain testified that she cleans the house, washes clothes, and watches TV; she used to like to fish, but cannot do that by herself any more (Tr. p. 36).  Sylvain testified that she does not have any problems sleeping because her medicine makes her sleepy (Tr. p. 36).

Sylvain testified that she was in an auto accident because her boyfriend had left the keys to her car; he had previously pulled the license plates from the car and stopped insuring the car to prevent Sylvain from driving it, but had recently put the plates back on and left the keys, so Sylvain drove it even though it was not insured; while driving, Sylvain had a seizure, passed out, and wrecked the car (Tr. p. 37).  Sylvain testified that her father told her she drove his truck once, also, but she has no recollection of that, and her father hides his car keys now (Tr. p. 44).  Since the accident, Sylvain has resumed going to LSU Medical Center regularly and her medications have been adjusted, but they just make her sleepier (Tr. p. 38).  Sylvain testified that she has most of her seizures in her sleep; her doctor told her the medication would keep her calm and relaxed so she does not fall out of bed (Tr. p. 38).

Sylvain testified that she has been having seizures for about fourteen years, but had continued to work; she loves to work and it is difficult to not have an income (Tr. p. 40).

Sylvain testified that her medication has caused her to lose weight, and causes sleepiness, which is difficult since she has a

11

two-year-old child (Tr. p. 44). Sylvain also testified that her medicine causes her to relax so much that she urinates in bed when she has a seizure while she is sleeping (Tr. p. 46). Sylvain testified that she has to change the sheets on her bed every three or four days (Tr. p. 46). Sylvain testified that her seizures have increased, which her doctor told her is something that happens over time; he recommended that she go to the neurology center in Dallas, but she did not go because she did not have anyone to keep her baby (Tr. p. 48).

The Vocational Expert ("VE") testified that Sylvain's past work as a certified nurse's assistant, DOT 355.674-014, was medium work, SVP 4 (Tr. p. 52). The VE further testified that Sylvain's past work as a psych aide, DOT 355.377-014, was medium work, SVP 4 (Tr. p. 52). The VE testified that Sylvain's past work as an MR tech as the special education center, DOT 355.377-018, was medium work, SVP 6 (Tr. p. 52).

The ALJ posed a hypothetical to the VE which involved a person of Sylvain's age, education, and work experience, who is limited to medium work with seizure restrictions (no working at heights or with dangerous or moving machinery, no driving) (Tr. p. 52). The VE testified that such a person would not be able to do any of Sylvain's past work (Tr. p. 52) because her past work involves handling patients, moving cleaning fluids around, and working with clients who have maladaptive or criminal behaviors (Tr. p. 53). The VE further testified that such a person would be able to work as a hand packager (SOC code group 537064, unskilled, light work,

12

314,000 jobs in the national economy and 2000 jobs in Louisiana), a general office clerk (SOC code 439061, unskilled, light work, 226,000 light, unskilled jobs in the national economy or 97000 jobs in the unskilled, sedentary level, and 3000 unskilled, light jobs in Louisiana or 1300 jobs at the unskilled, sedentary level (Tr. p. 54).

The ALJ changed the hypothetical to assume that, because of her condition, the claimant would miss work on a regular basis up to two to three days per month (Tr. p. 54). The VE testified that such a person would not be able to work at those jobs because she would exceed the typical one day off per month sometimes available in jobs like those (Tr. p. 54).

<u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Sylvain (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995),

13

citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Sylvain has not engaged in substantial gainful activity since July 6, 2010 (Tr. p. 13), and that she has severe impairments of seizure disorder and diabetes (Tr. p. 14), but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 14). The ALJ also found that Sylvain is unable to perform any of her past relevant work (Tr. p. 19).

At Step No. 5 of the sequential process, the ALJ further found that Sylvain has the residual functional capacity to perform the full range of medium work except as reduced by her inability to drive and she must avoid exposure to heights, dangerous machinery, and moving machinery (Tr. p. 15). The ALJ found that the claimant is a younger individual with at least a high school education and that the transferability of work skills is not relevant (Tr. p. 19). The ALJ concluded there are a significant number of jobs in the national economy which Sylvain can perform, such as hand packager and general office clerk and, therefore, Sylvain was not under a "disability" as defined in the Social Security Act at any

time through the date of the ALJ's decision on November 21, 2011 (Tr. pp. 19-20).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v.

<u>Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

Law and Analysis

<u>Credibility Assessment</u>

Sylvain contends the claimant's description of the frequency of her seizures was improperly rejected without the proper assessment of credibility required by the regulations, and that the ALJ's failure to provide a proper assessment of credibility is not a harmless error.

A claimant's symptoms will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §404.1529(c)(4). The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. <u>Elzy v. Railroad Retirement Bd.</u>, 782 F.2d 1223, 1225 (5th Cir. 1986); <u>Loya v. Heckler</u>, 707 F.2d 211, 215 (5th Cir. 1983). The ALJ's decision on the severity of symptoms is entitled to

16

considerable judicial deference. James v. Bowen, 793 F.2d 702, 706 (5th Cir. 1986); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). Such a credibility determination is within the province of the ALJ. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 128-29 (5th Cir. 1991). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. Falco v. Shalala, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to the frequency of Sylvain's seizures and her credibility (Tr. pp. 17-18):

> "The claimant has maintained that she has memory problems. However, according to records from the claimant's prior claim, the claimant is able to remember, understand, and repeat the claimant's treating source consultation. This shows the claimant is not as impaired as alleged and undermined her credibility.
>
> "No health care provider, who examined the claimant, reported that the claimant was unable to work.
>
> "The claimant has not required emergency treatment for her seizures. If the claimant were experiencing an increase in frequency or severity of her seizures, then she would have reported to the emergency room for treatment. The claimant did not do so. This suggests that the claimant is not as disabled as alleged.
>
> "In her Adult Function Report, the claimant reports that she launders clothes, walks, shops for groceries, and takes care of her two-year-old child. The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling seizures. This suggests that the claimant is not as disabled as alleged.
>
> "Although the claimant has received treatment for seizures, that treatment has been conservative and routine versus more aggressive medication dosages or emergency room admittance. Additionally, there have been significant periods since the alleged onset date during

> which the claimant has not taken any diabetes medication. The claimant just has not received the type of medical treatment that one would expect for a totally disabled person. This undermines the claimant's credibility that she is incapable of performing any work.
>
> "The record reveals that the claimant failed to follow up on recommendations made by Dr. Ugokwe. The claimant reports that her insurance did not cover the referral. However, the claimant has been receiving treatment through the charity hospital system at little to no cost to her. This suggests that the claimant's impairments are not as severe as alleged because medical treatment is available to the claimant that she elected not to undergo. This is consistent with the claimant's habitual noncompliance with her diabetes treatment. This inconsistency undermines the claimant's credibility. ...
>
> "The claimant testified that she has not been to the emergency room in the past year for seizures. In fact, other than dosage adjustments, the claimant's treating source has not changed the claimant's medication. This shows that the claimant's impairments are not as disabling as alleged because if the claimant was not responding satisfactorily, then her treating source would change her medication of treatment. ... The fact that the claimant remains a validly licensed driver demonstrates that the claimant is not as disabled as alleged because the claimant must have maintained that she is not limited by her seizures to the Louisiana Department of Motor Vehicles."

Since the ALJ in this case has made the mandatory indication of the basis for his credibility choices concerning claimant's complaints, and since his choices are not unreasonable, his finding that Sylvain's seizures would not prevent Sylvain from performing work is proper. <u>Carry v. Heckler</u>, 750 F.2d 479, 485-86 (5th Cir. 1985). It is noted that the only evidence of the frequency, duration, and symptoms of Sylvain's seizures was from Sylvain herself. As when attempting to prove a claimant meets Listing 11.00, evidence from a health care provider or other person who personally observed the seizures would have supported Sylvain's

18

claims.  Moreover, as alluded to by the ALJ, if a claimant does not follow the prescribed treatment without a good reason, she will not be found disabled.  20 C.F.R. § 404.1530(b).  Finally, Sylvain worked for fourteen years with epilepsy and diabetes; although she must now take seizure precautions, those precautions do not preclude all work activity.

Therefore, substantial evidence supports the Commissioner's conclusion that Sylvain is not disabled by her seizures and diabetes.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Sylvain's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 21st day of November 2013.

```
_____
        JAMES D. KIRK
  UNITED STATES MAGISTRATE JUDGE
```